1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3    UNITED STATES OF AMERICA,        )
                                      )
4              Plaintiff,             )
                                      )
5    v.                               )    September 17, 2018
                                      )
6    BLESSINGS, INC. (1),             )    No. 3:17-CR-1254-BEN
     DAVID MAYORQUIN (2),             )
7    RAMON TORRES MAYORQUIN (3),      )
                                      )
8              Defendants.            )
     _____)    San Diego, California

9

10

11

12

                TRANSCRIPT OF DIGITALLY RECORDED PROCEEDINGS
13                        (Imposition of Sentence)

14

15

16        BEFORE THE HONORABLE ROGER T. BENITEZ, SENIOR JUDGE

17

18

19

20

21

22   COURT REPORTER:            AMANDA M. LeGORE
                                RDR, CRR, CRC, FCRR, OCE
23                              U.S. District Court
                                333 West Broadway, Suite 420
24                              San Diego, CA 92101
                                amanda_legore@casd.uscourts.gov

25

```
 1   APPEARANCES:
     FOR THE PLAINTIFF:        MELANIE PIERSON
 2                             U.S. Attorney's Office
                               Southern District of California
 3                             880 Front Street, Room 6293
                               San Diego, CA  92101-8893
 4                             (619)557-5610

 5
     FOR DEFENDANT BLESSINGS,
 6   INC., AND DAVID
     MAYORQUIN:                DAVID WILLINGHAM
 7                             TREVOR STUTZ
                               Boies Schiller Flexner, LLP
 8                             725 S. Figueroa Street, 31st Floor
                               Los Angeles, CA  90017
 9                             (213)629-9040

10

11   FOR DEFENDANT RAMON
     MAYORQUIN:                GREGORY VEGA
12                             Seltzer Caplan McMahon Vitek
                               750 B Street, Suite 2100
13                             San Diego, CA  92101
                               (619)685-3003
14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Monday, September 17, 2018; 11:09 a.m.)

2

3                    P R O C E E D I N G S

4

5          THE COURT:  All right.

6          THE CLERK:  2 on calendar, 17-CR-1254, USA versus

7    Blessings, Inc., David Mayorquin, Ramon Torres Mayorquin.  All

8    set for sentencing with a presentence report.

9          MS. PIERSON:  Good morning.  Melanie Pierson on

10   behalf of the United States.

11         MR. WILLINGHAM:  Good morning, your Honor.  David

12   Willingham and Trevor Stutz on behalf of Defendants David

13   Mayorquin and Blessings.

14         MR. VEGA:  Good morning, your Honor.  Gregory Vega on

15   behalf of Defendant Ramon Mayorquin, who is before the Court,

16   on bond, for sentencing.

17         THE COURT:  Well, let me -- let me turn to

18   Ms. Pierson.

19         Ms. Pierson, do you have a preferred order?

20         MS. PIERSON:  I guess I would ask that you start with

21   Ramon Mayorquin and then move to the corporation.  Because I

22   really think the only dispute between the parties is as to the

23   final sentence for David Mayorquin.

24         Would defense counsel agree with that?

25         MR. WILLINGHAM:  Yes.  That is, we've narrowed the

1    disputes, your Honor.  And that is correct.  It's the only real

2    dispute amongst the parties, anyway, is that --

3            THE COURT:  Well, brilliant minds think alike.  I was

4    thinking Mr. Mayorquin would probably be the first one to get

5    out of the box.

6            All right.  I should indicate for the record that I

7    understand under *Booker* the guidelines are advisory.  I'll

8    impose sentence based on 3553(a) factors.  I'll use the

9    guidelines as a starting point for my -- for my sentence.

10            All right.  Now, I believe -- I believe everybody's

11   in agreement that Mr. Ramon Mayorquin should receive probation,

12   if I'm not mistaken, and I'm prepared to adopt that.

13            I think there's a question -- I don't know.  Perhaps

14   there's a question about a fine.

15            I think Probation is recommending a thousand dollar

16   fine, and I certainly do not find that to be objectionable.

17            So I should start out by telling you that my

18   tentative is to adopt the Government's recommendation of three

19   years probation and a thousand dollar fine, plus a hundred

20   dollar special assessment.  So --

21            MR. VEGA:  Your Honor, if I may?

22            THE COURT:  Yes.

23            MR. VEGA:  I believe in the Government's sentencing

24   chart it was two years probation, a thousand dollar fine, and

25   the $100 penalty assessment.

1    THE COURT:  Well, you're right.  My notes say three.
2  Maybe I decided I wanted three, rather than two.  But to be
3  honest with you, I wouldn't get heartburn either way.  So if
4  I -- if I -- impose two years probation, a thousand dollar
5  fine, and a hundred dollar special assessment, will you submit
6  the matter?

7    MR. VEGA:  Yes, your Honor.

8    MS. PIERSON:  Yes, your Honor.

9    THE COURT:  All right.  Well, Mr. Mayorquin, you have
10  a right to address the Court.  I've already indicated what my
11  sentence would be.  You don't have to say anything, if you
12  don't want to.

13    Is there anything you want to say?

14    THE DEFENDANT THROUGH THE INTERPRETER:  Just that I'm
15  very sorry about this.

16    I have never been before the Court before.  And I
17  apologize very sincerely.

18    THE COURT:  All right.  Does Probation have anything?

19    PROBATION OFFICER LEE:  Nothing further, your Honor.

20    THE COURT:  All right.  The guidelines are as
21  follows:

22    This is a Base Offense Level of 4, reduce by two
23  levels for acceptance.  He has no criminal history score.
24  Criminal History Category I.  Range of imprisonment is zero to
25  six months.

1    After considering the 3553(a) factors, I'm satisfied

2  that a probation for a period of two years is appropriate.

3  It's sufficient but not greater than necessary.  So I'll put

4  him on probation for a period of two years.

5    As a condition of his probation, he'll obey all laws;

6  state, local, and federal.  He'll comply with all standard

7  mandatory conditions, including the following:

8    He'll submit his person, his property, his residence,

9  his office, or his vehicle to a search conducted by a United

10  States probation officer at a reasonable time and in a

11  reasonable manner, based upon reasonable suspicion of

12  contraband or evidence of a violation of a condition of

13  release.

14    Failure to submit to a search may be grounds for

15  revocation, and the defendant shall warn any other residents

16  that the premises may be subject to searches pursuant to this

17  condition.

18    He will not enter or reside in the Republic of Mexico

19  without permission of the Court or the probation officer, and

20  he will comply with both the United States and Mexican

21  immigration law requirements.

22    He will provide complete disclosure of personal and

23  business financial records to the probation officer as

24  requested.

25    He'll notify the collections unit of the United

States Attorney's Office of any interest in property obtained directly or indirectly, including any interest obtained under any other name or entity, including a trust, partnership, or corporation until a fine or restitution is paid in full.

He will notify the collections unit, the United States Attorney's Office before transferring any interest in property owned or -- directly or indirectly, including any interests held or owned under any other name or entity, including the trust, partnership, or a corporation.

He will be prohibited from opening checking accounts or incurring new credit charges or opening additional lines of credit without approval of the probation officer.

Now, the range for the fine appears to be $25,000 to $250,000, but he -- it does not appear that he has the ability to pay that fine. However, a thousand dollars fine would appear to be appropriate. So I'll order that he pay a thousand dollar fine, payable forthwith.

Mr. Vega, is he able to pay that fine at this time?

MR. VEGA: Not forthwith, but if you can give us 30 days, your Honor.

THE COURT: All right. I'll order that he pay that fine within 30 days, along with a hundred dollar special assessment.

All right. Mr. Vega, if you would deliver to him the conditions of probation, I would appreciate it.

1          MR. VEGA:  Your Honor, I will.

2          There's one thing.  He had just recently moved and

3    Probation Officer Matt Bass asked that I put his new address on

4    the record.  So his new address is 1331 North Echo Ridge Way,

5    Chula Vista, California, 91915.

6          THE COURT:  And how do you spell Echo Ridge?  Is it

7    E-C-H-O or E-C --

8          MR. VEGA:  E-C-H-O, separate word, "Ridge," separate

9    word "Way."

10         THE COURT:  Outstanding.  Great.  Thank you.

11         MR. VEGA:  Thank you, your Honor.

12         (Handed document.)

13         THE COURT:  All right.  Mr. Mayorquin, you have in

14   your possession the probation conditions.  If you violate any

15   of those conditions, sir, you can be placed in custody for up

16   to two years.

17         So please make sure that you follow the conditions

18   and don't deviate.  Okay?

19         I'll order that he go to the probation department no

20   later than 4:00 p.m. this afternoon in order to have a

21   probation officer assigned to him and then be interviewed, et

22   cetera.

23         Mr. Vega, do you acknowledge that he's waived his

24   right to appeal and collateral attack?

25         MR. VEGA:  Yes, your Honor.

1          THE COURT:  Mr. Mayorquin, do you acknowledge that
2    you've waived your right to appeal and collateral attack?
3          THE DEFENDANT THROUGH THE INTERPRETER:  Yes.
4          THE COURT:  All right.  Is there anything else we
5    need to address, anything I've missed, anything I've
6    overlooked?
7          MS. PIERSON:  I move that the remaining counts be
8    dismissed.
9          THE COURT:  All right.  The remaining counts will be
10   dismissed.
11         Thank you.
12         MR. VEGA:  Thank you, your Honor.
13         MS. PIERSON:  And I think bond should be exonerated.
14         THE COURT:  Oh, yes.  That's -- thank you for
15   reminding me.  Bond will be exonerated.
16         All right.  Who's next?
17         MR. WILLINGHAM:  Yes, your Honor.  David Willingham
18   on behalf of Blessings, which I am appearing on behalf of.
19         If the Court would have -- would like Mr. Mayorquin,
20   to stand here on behalf of the company, he will.  Just whatever
21   the Court preferences.
22         There's no real dispute amongst the parties as to the
23   entity.
24         MS. PIERSON:  That is correct.  The parties are
25   jointly recommending a fine of $717,700.  And that fine would

be payable to the Lacey Act rewards fund.  That they would have
five years of probation to pay it, but of course we would be
willing to let probation terminate sooner if they were able to
pay sooner.  And a $400 penalty assessment.  The forfeiture of
$237,879 has already been paid, but I would ask that the Court
orally pronounce that as part of the sentence.

THE COURT:  So, let me make sure I understand.  As to
both David Mayorquin and Blessings, Inc., the Court would
impose five years probation?

MS. PIERSON:  Right.

THE COURT:  And a fine of -- what was it?  717,700?

MS. PIERSON:  700.  And the company would like to pay
it in equal annual installments.

THE COURT:  Of?  Equal annual installments of?

MS. PIERSON:  I didn't do the math on that.  Sorry.

THE COURT:  Are you saying $717,700, divided by five?

MR. WILLINGHAM:  That is correct, your Honor.  We'll
do the math shortly.

THE COURT:  Well, I can break out my trusty little
calculator here.

Let's see.

MR. WILLINGHAM:  We've turned off our calculators in
order to be respectful of the Court.

THE COURT:  $143,540.  Does that sound right?

THE CLERK:  Yes.

1          THE COURT:  Okay.  And there would be a forfeiture of

2     $237,379 --

3          MS. PIERSON:  No, 879.

4          THE COURT:  I'm sorry?

5          MS. PIERSON:  879, I think.

6          THE COURT:  Well, my reporter has 379, and that's

7     what I heard.  But whatever the number is.

8          MS. PIERSON:  Okay.

9          THE CLERK:  Is there an order -- I need a forfeiture

10    order.

11         MR. WILLINGHAM:  There was a forfeiture order that

12    has previously been entered, your Honor, and that order has

13    already been satisfied.  And the order was previously entered

14    in the amount of $237,879.  That was stipulated to --

15         THE COURT:  Okay.

16         MR. WILLINGHAM:  -- and already paid by Blessings.

17         THE COURT:  All right.  So I'll order that

18    restitution to be paid, and find that it has already been paid.

19    Correct?

20         MS. PIERSON:  Yes.

21         THE COURT:  Ms. Pierson?

22         MR. WILLINGHAM:  Forfeiture order, your Honor, just

23    to be --

24         THE COURT:  I'm sorry.  Forfeiture.

25         MR. WILLINGHAM:  There is no loss associated --

1          THE COURT:  Yeah, I'm sorry.  I said --

2          THE CLERK:  But, your Honor, you still want it as

3 part of the judgment.  Correct?

4          THE COURT:  Yes.

5          THE CLERK:  Okay.  That's all I need to know.

6          THE COURT:  All right.  And let me see.

7          THE CLERK:  And, your Honor, the fine is to both the

8 corporation and this defendant.  Correct?

9          THE COURT:  Yes, it would be --

10          MR. WILLINGHAM:  Oh, your Honor, that is -- the

11 agreement is -- and I believe with regard to the corporation --

12 the fine applies to the corporation.  But as to the defendant

13 Mr. Mayorquin separately, he does not have the ability to pay

14 it, and that was not the agreement amongst the parties.

15          THE COURT:  Well, let me ask a question because -- it

16 seemed -- when Ms. Pierson said what she said, in answer to the

17 question that I had from the get-go -- when I was reviewing

18 this file, I thought, so -- so great.  So Blessings, Inc.,

19 agrees to this large fine but Mr. David Mayorquin does not.

20          But what assurances are there that tomorrow

21 Blessings, Inc., isn't going to say I'm so sorry, so sad, we're

22 filing bankruptcy, or we're going out of business, and that

23 fine doesn't ever get paid?

24          MR. WILLINGHAM:  May I speak to that, your Honor?

25          THE COURT:  Yes.

1           MR. WILLINGHAM:  First, your Honor, Mr. Mayorquin, I

2   believe, through satisfying the forfeiture order on time and in

3   full has shown the resolute dedication to satisfy the order of

4   the Court on behalf of Blessings as a primary consideration.

5           THE COURT:  Yeah, but that doesn't answer what would

6   happen in the future.

7           MR. WILLINGHAM:  Second, I understand, if the Court

8   is concerned about the payment of that restitution order or

9   that fine -- because it's not a restitution, remember.  It's --

10          THE COURT:  Yeah, a fine.

11          MR. WILLINGHAM:  It's different.  Because there's no

12  loss associated with that offense.

13          That the Court does have a concern with regard to the

14  company not being able to satisfy that due to secondary issues.

15          This, as the Court is well aware -- this -- this

16  offense and this investigation has devastated the company but

17  it is still afloat.  And Mr. Mayorquin has worked very, very

18  hard, with full disclosure to his banking entities and full

19  disclosure to his vendors and customers -- some of whom are

20  here, your Honor.  And we'll get to that in a minute -- with

21  regard to building the company back up to where it was.

22          So that issue of payment won't be a concern to the

23  Court.  The issue is --

24          THE COURT:  Well, I mean -- I appreciate your

25  representation, Counsel.  But, you know, it's not the first

time that I've heard someone say that they have all of the best
intentions of doing something, and then something goes south
and it doesn't ever get paid.

And you were probably here a little while ago when
Mr. Pilchak said that, you know, it's an objection.  That
people who commit white collar crimes are sometimes able to pay
a fine and not do custodial -- custodial time.  Right?

Well, I don't find it to be a perversion.  I find it
to be sometimes it's an adequate or an appropriate way of
restoring or paying the consequence of having committed an
offense.

So what I'm saying is -- as I understood
Ms. Pierson -- the defendant, David Mayorquin, would get
probation.

MS. PIERSON:  That's -- we're not seeking probation.
We're seeking a year in custody for David.

THE COURT:  I see.  Okay.

MR. WILLINGHAM:  That's the only dispute the parties
have.

THE COURT:  So that's the only dispute.  So to -- to
be frank -- or to be Roger, to be specific -- I can be bought.
I can, I think, under certain circumstances -- and have in the
past -- not imposed a custodial sentence for someone if I
believe that that will in fact allow a company to continue to
run and will in fact promote the payment of, say, a large fine

1  or a large restitution.

2      So what I'm saying to you, in case you haven't read

3  between the lines, is that before I even begin to consider your

4  request for probation, I would have to have some assurances

5  that that $717,000 would be paid.

6      I have various suggestions of how that could, for

7  example, get accomplished.  As best as I can tell, this company

8  has a minimum and -- has a facility that has, I think, $800,000

9  worth of equity, assuming that I buy the value that's been

10  placed upon it.

11      Certainly a deed of trust to the Government for

12  purposes of supporting that fine and making assured that that

13  fine would be paid, that would be one way of easing the Court's

14  mind.

15      Perhaps I'm overstepping my -- my authority.  Perhaps

16  I should leave this to Ms. Pierson.  Perhaps Ms. Pierson would

17  rather have Mr. Mayorquin do time and not be so concerned about

18  the fine.

19      But those are the things that were going through my

20  mind when I was going through this file.  It struck me that,

21  you know, I -- I was in private practice for over 18 years.

22  I've seen some interesting things happen with corporations, and

23  so on.

24      And so a fine of $717,000 to this corporation,

25  without any kind of assurances that it would be paid is,

1   frankly, very meaningless.

2          So would you -- would you guys like to take a little

3   break and talk about this or are we ready to go forward?

4          MS. PIERSON:  We're ready to go forward.

5          MR. WILLINGHAM:  We're ready to go forward, your

6   Honor.  And I can speak to the Court's concerns somewhat

7   directly.

8          THE COURT:  Okay.

9          MR. WILLINGHAM:  And I'm not sure that the Government

10  will end up agreeing.  But I think if the Court is concerned

11  about that -- not that we are trying to buy the Court, your

12  Honor -- but I believe Mr. Mayorquin, as I just said, has

13  demonstrated already his commitment to make good on his

14  mistakes.

15         Your Honor, as -- as Ms. Pierson knows, I have worked

16  very hard to -- to craft a way for a resolution to provide a

17  path forward for the family, for Mr. Mayorquin, and the company

18  itself in order to make good on these issues.

19         I -- in doing so, I've spoken directly with its

20  biggest customers, I've spoken with vendors.  And with regard

21  to the equity the Court just referenced, I just had a call --

22  I've been continually in -- in -- over the last year or so in

23  communications with the bank, through its lawyers, that have

24  been well informed of this issue and well informed of this

25  hearing this morning.

1      THE COURT:  Are you talking about the bank that

2  holds -- a mortgage on the two properties that are owned?

3      MR. WILLINGHAM:  I am, your Honor.  If fact, that

4  note is due.  And, in fact, the bank is very interested in the

5  result today.

6      THE COURT:  I see.

7      MR. WILLINGHAM:  Because if Mr. Mayorquin does get

8  placed on probation, they have every faith that he will

9  continue to honor his debt, your Honor.

10     They have the ability to call that note.  They don't

11  want to.  And as I explained to Ms. Pierson this morning, I had

12  that very conversation with their lawyer and offered to put

13  Ms. Pierson in touch with their lawyer in advance of this

14  hearing.

15     THE COURT:  Tell me about Blessings, Inc., tell me

16  about -- who are the officers?  Who are the shareholders?

17     MR. WILLINGHAM:  Well, the Blessings, Inc.,

18  historically, your Honor, was owned and operated by --

19     THE COURT:  Not historically.  Who owns it now?

20     MR. WILLINGHAM:  Mr. Mayorquin.

21     THE COURT:  So this gentleman owns the stock in the

22  corporation?

23     MR. WILLINGHAM:  Yes.

24     THE COURT:  All right.  All of it?

25     MR. WILLINGHAM:  All of it.

1           THE COURT:  Okay.

2           MR. WILLINGHAM:  Historically, though, it was

3   co-owned and operated by him and his brother Abraham Mayorquin.

4   But because of the essential failure in the company in the last

5   number of years as a result --

6           THE COURT:  Yeah.  He's the fellow who owns the

7   company down in Mexico, to whom this company --

8           MR. WILLINGHAM:  No your Honor.

9           THE COURT:  That company owes this company a whole

10  bunch of money, as I recall.

11          MR. WILLINGHAM:  No, your Honor.  This gentleman

12  here, owns both --

13          (Pause, Mr. Willingham and Defendant David Mayorquin

14          conferring.)

15          MR. WILLINGHAM:  Yes, there is some debt that is owed

16  by Blessings, Inc., to the Nogales entity.  I'll call it the

17  Nogales entity.  And that is --

18          THE COURT:  So I wasn't completely incorrect.  So I

19  wasn't totally incorrect.  Right?

20          MR. WILLINGHAM:  No.  No, you weren't.

21          THE COURT:  So --

22          MR. WILLINGHAM:  But, your Honor, I think I can cut

23  to the chase and save the Court some time and consideration

24  without --

25          THE COURT:  Let's see.

1    MR. WILLINGHAM:  Mr. Mayorquin has informed me that

2 he is willing to stand by the debt personally.  So to the

3 extent that the Court is concerned about the company making

4 good on its promises and Mr. Mayorquin's sincerity in

5 fulfilling its obligations to the Court, he will accept the

6 fine personally as well.

7    The caveat here, your Honor, is -- and I can report

8 as an officer of the Court -- and it's in our papers -- we have

9 spoken with the customers, the vendors, and the bank.  And

10 should Mr. Mayorquin go into custody, that simply -- the

11 ability to operate this business will cease.

12    And I know that where -- where Ms. Pierson and I

13 differ is she does have some belief that it's possible that

14 someone else can pick that ball and run it through the goal

15 line for the company.  But after multiple conversations with

16 its biggest customer, which was Costco, which has ceased --

17 hopefully temporarily -- business operations with the company,

18 with vendors, and with its bank, Mr. Mayorquin, here before the

19 Court, is central to the business operations of the company.

20    And I know we're not talking about his sentencing,

21 your Honor.  We're just talking about the corporate fine in a

22 moment.  But to the extent the Court has that concern, we hope

23 to resolve that concern and proceed forward.

24    THE COURT:  Let me ask Ms. Pierson a question.

25    Where does this $717,700 come from?  Where does

1  that -- where does that come from?

2      MS. PIERSON:  That was based on negotiations between

3  the parties relative to what the guideline range was versus

4  what we thought their ability to pay was.  We arrived at

5  that -- that number.

6      THE COURT:  All right.  I -- I believe probation had

7  indicated the fine of 923,000, or something like that.  Is that

8  correct?

9      MS. PIERSON:  Something greater.  I can't remember

10  exactly.  But something greater, yes.

11      THE COURT:  (Pause.)  Let me ask you a question.  I'm

12  a little troubled by a couple of things.

13      First of all, I was looking at Mr. Mayorquin's

14  financial disclosure to Probation.  According to that, it shows

15  that he has a negative cash flow every month of $3,683.02.

16  Explain to me how that happens.  I mean, if you have a negative

17  cash flow of $3,000 a month every month, how does that work?

18      MR. WILLINGHAM:  Your Honor, a couple of things.

19  When this case -- I'll start very briefly.  When this case and

20  the investigation started, the Mayorquin family was running a

21  very successful business, and it established a home and a

22  lifestyle, including kids going to private school, thing like

23  that.

24      In the recent times, Mr. Mayorquin has had to move

25  from that house.  They -- the company, as you've seen, has

1  suffered devastating financial times.  He still has 11

2  employees that he has to pay.

3          And the very family members that the Court sees

4  behind him are supplementing his ability to survive at the

5  moment.  They believe in him.

6          THE COURT:  You mean that he's -- he's getting money

7  from his relatives to live?

8          MR. WILLINGHAM:  Yes.  Yes, your Honor.

9          THE COURT:  So they're giving him money to pay for

10 groceries, to pay his mortgage.

11         MR. WILLINGHAM:  Your Honor, they had to get rid of

12 the house, and they've removed the children from private

13 school.

14         So those -- as it's gotten significantly worse over

15 time, that was the case.

16         THE COURT:  I see.

17         MR. WILLINGHAM:  And as we come closer to this day,

18 your Honor, they have made arrangements to limit those expenses

19 as much as possible.  But, yes, they've been helping as much as

20 they can.

21         THE COURT:  Now, when you -- when you say they

22 eliminated the mortgage, so the house at 2901 East Calle Sin

23 Pecado, in Tucson, what happened to that house?

24         MR. WILLINGHAM:  They're renting it out, your Honor.

25         THE COURT:  Oh, I see.  So they still own it?

1          MR. WILLINGHAM:  Yes.

2          THE COURT:  How much rent --

3          MR. WILLINGHAM:  They downsized their life, your

4     Honor.

5          THE COURT:  How much rent are they getting on it?

6          MR. WILLINGHAM:  May I inquire, your Honor?

7          THE COURT:  Sure.

8          MR. WILLINGHAM:  The -- I am informed that they will

9     be getting $4500 a month for that rental.

10         THE COURT:  Is it a month-to-month rent or is it a

11    lease?

12         MR. WILLINGHAM:  A lease, your Honor.

13         THE COURT:  For how long?

14         MR. WILLINGHAM:  I would imagine it's a year with a

15    month-to-month follow up.

16         THE COURT:  Don't imagine.

17         MR. WILLINGHAM:  I've confirmed, yes.

18         THE COURT:  Okay.  All right.  Let me turn to --

19    there was something in the Blessings, Inc., financial affairs

20    that caused me some confusion.

21         (Pause, referring.)

22         THE COURT:  And we sort of briefly touched upon it a

23    minute ago, but I want to go back over it, if I can.

24         (Pause, referring.)

25         THE COURT:  All right.  In the presentence report

1   submitted on the Blessings, Inc., matter, it shows at page

2   15 -- it says that there's a loan receivable from Adab -- which

3   I believe is his brother's company.  Right?  In Mexico?  Or --

4   do I understand that correctly?

5           MR. WILLINGHAM:  It's a co-owned company, your Honor.

6   Not just the brother.  Yes.

7           THE COURT:  What kind of a company?  Is it a Mexican

8   corporation?

9           MR. WILLINGHAM:  Your Honor, so the way Blessings

10   operates -- and, yes.  The short answer is yes.

11           It has a processing plant in Nogales, Mexico.  And

12   often the Court has been gracious enough to allow Mr. Mayorquin

13   to travel internationally for this.  And this is the reason why

14   that was ordered at the time, with no objection from the

15   Government.  That company is co-owned by the brothers and does

16   work on behalf of Blessings, Inc., essentially, in order to

17   help process the product, so that way it can in fact get sold

18   and -- and -- imported and ultimately sold to the customers

19   here.  So that's --

20           THE COURT:  According --

21           MR. WILLINGHAM:  -- the nature of the relationship.

22           THE COURT:  According to the probation report, it

23   shows that that company owes -- owes Blessings, Inc.,

24   $2,549,810.

25           (Pause, Mr. Willingham and Defendant David Mayorquin

1          conferring.)

2          MR. WILLINGHAM:  Your Honor -- correct, your Honor.

3          THE COURT:  All right.

4          MR. WILLINGHAM:  And, your Honor, if I may point out,

5  the Nogales company, which is owned by Adab, has also

6  significantly down -- downsized, because, obviously, Blessings,

7  Inc., is its customer; and has provided operational support to

8  Blessings.  But, as you can see, that there -- there are moneys

9  owed to Adab as a result of that.

10          THE COURT:  Wait a minute.  This says it's a loan

11  receivable.  A loan receivable --

12          MR. WILLINGHAM:  I'm sorry.  Moneys -- what Adab owes

13  Blessings as a result of that, in their operation.

14          THE COURT:  So Adab owns -- owes Blessings, Inc. some

15  amount.

16          MR. WILLINGHAM:  Correct.

17          THE COURT:  Which, according to the Probation report,

18  is $2,549,000 and some change?

19          MR. WILLINGHAM:  That is correct, your Honor.  And

20  I'm sorry for reversing the who and what.  That was simply a

21  speaking error.

22          THE COURT:  You -- you spoke inartfully.

23          MR. WILLINGHAM:  Yes.

24          THE COURT:  Now, in looking at the liabilities,

25  there's a loan payable related party.  It doesn't say who the

1   related party is.  That Blessings owes $266,402.  What is that?

2          MR. WILLINGHAM:  May I confer with Mr. Stutz, your

3   Honor?  He's actually the brains of the operation.  He's

4   writing me a note as I'm speaking.

5          (Pause, conferring.)

6          MR. WILLINGHAM:  Your Honor, Mr. Stutz helped us

7   prepare the detailed financial statement that we provided to

8   the Probation Office with regard to the assets and liabilities.

9   And we believe that that is -- we don't have that in front of

10  us.  We believe that's a loan that was made to the company by

11  one of the brothers of the Mayorquin family.

12         Not Mr. Mayorquin.  Not Abraham Mayorquin, who's the

13  former co-owner, but one of the other brothers.

14         Correct?

15         DEFENDANT DAVID MAYORQUIN:  (Nods head.)

16         THE COURT:  Well, that should be pretty easy to

17  ascertain who the loan was made by.  Mr. Mayorquin ought to

18  know.  Right?

19         MR. WILLINGHAM:  He does, your Honor.  That's where

20  I'm getting the information -- that's where I'm getting the

21  information from.

22         THE COURT:  So who was the brother?  Which brother

23  was that?

24         MR. WILLINGHAM:  It is José Mayorquin, your Honor.

25         THE COURT:  So José Mayorquin loaned the -- the

1 corporation $266,402. Right?

2 THE DEFENDANT: Yes, your Honor. Yes, your Honor.

3 THE COURT: Is that correct?

4 MR. WILLINGHAM: And, your Honor, just for the

5 record, I believe that the loan was slightly more than that.

6 Some of it had been repaid over time.

7 THE COURT: And according to this, the company has a

8 shareholder's equity of $1,031,383.

9 (Pause, Mr. Willingham and Defendant David Mayorquin

10 conferring.)

11 MR. WILLINGHAM: Your Honor, those were in the

12 financials that we provided from the controller of the company,

13 Ms. McGuiness, who also wrote to the Court, to Probation.

14 As the Court, I'm sure, is aware, that the equity

15 basis of the company in dire straits as this is in flux at all

16 times because there's just simply -- whether or not you can

17 liquidate and actually get such equity is always a question.

18 But on the balance sheet, that's what we were provided.

19 THE COURT: So -- I mean, I'm trying to do my best to

20 go through this financial information. Why? Because I want to

21 have some reasonable -- I mean, I think probably the Government

22 should be doing this. They've got unlimited resources, and I

23 don't.

24 But if I understand this correctly, there's this

25 Thornydale Road property in Tucson that according to the

1    information provided to probation is worth $557,000.  But there

2    doesn't appear to be any mortgage on it.  It appears to be paid

3    for free and clear.  Is that correct?

4              MR. WILLINGHAM:  Not quite, your Honor.  There is no

5    mortgage debt owed on that property.  However, in both the

6    paperwork and in my conversations with the lender to the

7    company, that property is used to also secure the note to the

8    bank.  Meaning should the bank call the mortgage -- which it

9    can -- on the Highland Avenue property, it can go ahead and

10   collect not just on the Highland Avenue property but also on

11   the Thornydale Road property.

12             THE COURT:  How does it do that without a deed of

13   trust or a mortgage?

14             MR. WILLINGHAM:  It's got a promissory note secured

15   by that, your Honor.  It doesn't have a mortgage associated

16   with it but it's got a promissory note -- with -- with a

17   cross -- cross -- sorry.  A cross-collateralization agreement

18   with the bank.

19             THE COURT:  But just to make sure that I understand,

20   the amount that's owed on the Highland Avenue property is

21   $895,000.  That is as of the date that this -- the financial

22   information was given to Probation.  Right?

23             MR. WILLINGHAM:  Correct.

24             THE COURT:  But between the Highland Avenue property

25   and the Thornydale property, that's worth 1 million -- actually

one million six.  Right?  One million six?

MR. WILLINGHAM:  Is the Court saying together, your Honor?

THE COURT:  Yes.

MR. WILLINGHAM:  Roughly, yes.

If the Court is concerned -- I'm not -- I'm not sure I'm correct.  But, basically, the Court -- the company does have some assets and is trying to move forward from where it is here, just to get back to its business operations.

We believe, through our conversations and through its ability to survive thus far, that Mr. Mayorquin has the capacity to do that and is willing to put his own personal finances behind that, according to the Court's questions and the Court's concerns.

These assets, though, have been obviously pledged in order to secure funding in order to operate the company.  And in order for Mr. Mayorquin to succeed, he needs to be able to obviously utilize the processing plant that is here, as well as the collateral that is here in order to satisfy his bank to allow him to continue forward.

He has made those payments, your Honor.  I confirmed that on Friday.  They want to continuing to go forward with them.  I confirmed that on Friday.  They are obviously awaiting the Court's decision today.

THE COURT:  All right.  Anything else that you want

1   to tell me?

2           MR. WILLINGHAM:  Not about Blessings, Inc., your

3   Honor.

4           But if we're doing both, then I do want to take a

5   moment.

6           THE COURT:  Yeah.  Go ahead.

7           MR. WILLINGHAM:  First of all, your Honor, I alluded

8   to the family sitting in the back and off to my left.

9           They are all here:  Family, friends, and including

10  some vendors and business associates in the courtroom.

11          I would ask his wife, Amanda Mayorquin, to stand up.

12          (Spectator complying.)

13          MR. WILLINGHAM:  This has been a difficult time.  And

14  I would like to thank not only Mr. Mayorquin for the

15  opportunity to represent him but for the faith that he and his

16  family have put in me.

17          If the Court is inclined to agree with the sentencing

18  of probation as recommended by the Probation Office and us, I

19  don't want to take up too much of the Court's time.  I'll just

20  stop talking.

21          THE COURT:  Well, Probation is recommending a fine of

22  $973,490.

23          MR. WILLINGHAM:  Your Honor, for the company, yes.

24  And -- and I think Probation -- the -- we're -- we're shooting

25  different numbers here.  But to the extent that the Court has

1    indicated that it would impose a fine against the company,

2    Mr. Mayorquin has indicated that he would back that fine

3    against himself personally.

4           THE COURT:  All right.  Well, I'm going to tell you

5    that it's -- it's -- it's a nonviolent -- this is a nonviolent

6    offense, as I said in my, you know, opening remarks.

7           So I believe the Government's asking me to impose a

8    12-month sentence, which is not unreasonable.

9           MS. PIERSON:  Your Honor, I would like to be heard

10   with respect to David Mayorquin.  I thought we were just

11   addressing the corporation.

12          THE COURT:  I wasn't going to cut you out, Ms.--

13          MS. PIERSON:  Sounded like you were -- you were --

14          THE COURT:  Don't worry.  No, I'm trying to tell you

15   my tentative.

16          MS. PIERSON:  Okay.  Terrific.  Thank you.

17          THE COURT:  So you will be able to address it.  Okay?

18          So -- but I would never cut you off.

19          So -- so it strikes me -- so here's -- here's what

20   I'm thinking, Ms. Pierson.

21          You want me to put Mr. Mayorquin in custody for 12

22   months.

23          Now, it strikes me that if I do that, there's a whole

24   lot of dominoes that are going to fall and -- and what we will

25   have gotten is that Mr. Mayorquin has gone into custody on a

nonviolent offense.  And people will lose their jobs, and I won't be able to go to Costco anymore to buy their product. You know, the fish, or whatever.

        MR. WILLINGHAM:  Shrimp, your Honor.

        THE COURT:  I'm sorry?

        MR. WILLINGHAM:  Shrimp.  Processed shrimp.

        THE COURT:  I won't be able to have shrimp cocktail. And his family will lose the family support for 12 months.

        On the other hand -- on the other hand, it strikes me, Ms. Pierson, that if I get him to pay the fine -- especially the larger fine that probation is recommending -- it strikes me that it's a win-win situation because then that money could be used to help promote the environmental protections so that other people don't do the same sort of thing that has been going on.

        So, right now, Ms. Pierson, my tentative is to in fact adopt Probation's recommendation.  But, of course, as you know, I will hear from you and accept your -- or take your recommendations under consideration.

        So what do you think about my -- my tentative?

        MS. PIERSON:  You know, your tentative is clearly, you know, thoughtful, based on what you've reviewed in the presentence reports and the parties' papers.  However, you know, we -- we also have a different perspective here on this matter.

1       First of all, I don't believe that the money that the

2  company has -- and that seems to be the Court's concern,

3  whether or not we would be able to get our hands on the money.

4       I am confident that our collections unit will be able

5  to get their hands on the $717,700 that we have agreed upon.  I

6  believe that there are assets out there, without going into --

7  to great detail.  We did do an extensive review of the assets

8  of the company, where the money has gone here and there,

9  different places, different properties that are owned.  And --

10       THE COURT:  Help -- help me with that.  Don't play --

11  don't play poker and keep your cards close to the vest.

12       Because what I see here -- I mean, as I -- as I know

13  you've heard me say before, I was a lawyer in private practice

14  for 18 years.  And I know -- not that I ever did it, of course.

15  But I know that, you know, corporations are easy to -- to move

16  money around, to shelter it to, to file bankruptcies, et

17  cetera.

18       And from what I'm seeing here and from what I've

19  heard from counsel, there's a real possibility that this

20  company may not have assets to pay that fine.

21       So tell me what you know that I don't know.

22       MS. PIERSON:  All right.  What I know is that after

23  this investigation began, Blessings moved its operations to

24  Mexico.  They moved their processing plant and the jobs down.

25  They opened Adab, and, you know, opened that company in Mexico,

moving all of those jobs from Tucson to Mexico to save money.

They also transferred money to -- out of the U.S. into Mexico at that point before we ever filed the case, because this case was many years in --

THE COURT: So how would you get that back?

MS. PIERSON: We can't. That's -- right now we can't, but what we -- what we do know is that money went to Mexico. They bought a warehouse. There's infrastructure in Mexico. There's a company down there. They're operating there. They moved there to save money because they -- they can pay Mexican wages to process instead of Tucson wages to process.

Nonetheless, they still own the property in Tucson, which our collections unit could put a lien on and would be able to then get the Government's money back out of any sale that happened. We also --

THE COURT: Would you -- just a second. Would your lien be prior? Would it have greater priority than the lenders' lien?

MS. PIERSON: I would -- I would -- I guess I would need to talk to our collections people about that. I -- you know, I know that once --

THE COURT: Don't you think that would be --

MS. PIERSON: I don't know what the priorities are, as -- as far as all of that goes. But, surely, they would

1  have -- the proceeds of what would be left would be the

2  Government's -- the proceeds from the sale.

3        But we also learned that in the course of their

4  dealings, they lent -- a lot of money was transferred from

5  Blessings to -- that was ultimately used -- (coughing) excuse

6  me -- to buy property in Rancho Santa Fe.  That's being held by

7  the brother, José Mayorquin.  And we believe that -- you know,

8  that assets could be traced there.  It was over a million

9  dollars.  And --

10        THE COURT:  Whoa.

11        MS. PIERSON:  So, you know, we think that there are

12  other opportunities and other avenues that we might pursue.

13        We don't think that's going to be necessary because

14  we think that this company is going to be able to continue in

15  its work and continue to sell it, continue to be able to pay

16  these bills all on its own.  Because we do believe that it's a

17  viable company.  We believe that it is viable with or without

18  David Mayorquin.  Because the company was operated with his

19  brother Abraham Mayorquin from its inception, including to the

20  time that this case was filed.

21        Because Abraham Mayorquin actually signed the

22  corporate resolution authorizing Mr. Willingham to appear in

23  court on behalf of -- of --

24        THE COURT:  Tell me about the million dollars to buy

25  the house in Rancho Santa Fe.  That really gets my antennas

wiggling.

So you're saying that there was a million dollars that went out of -- of Blessings, Inc., after this case was filed?

MS. PIERSON:  No, not after the case was filed. During -- during the -- the offense period.  It's like from -- from 2010 to 2013, over a million dollars went.  And it's being -- the property is still being held.  It's simply appreciating in value.  We believe it's worth about $5 million today.  Or at least it was worth $5 million at the time that we filed the Indictment.

MR. WILLINGHAM:  Your Honor, may I speak to that, your Honor?

THE COURT:  Sure.

MR. WILLINGHAM:  I have a small correction to the Nogales plant.  That was actually opened before the investigation started but during the offense conduct in 2011, I believe.  Not -- not during the investigation.

With regard to the moneys that were transferred for the purposes of property, as the Court is already aware from the discussion, Mr. José Mayorquin has loaned money and still is owed money by the company in the past, long before the investigation ever started.  And during the offense conduct period, some of that money has been repaid, which is why I made it clear to say that there are still moneys owed to

1  Mr. Mayor -- José Mayorquin.  It's a family business, your

2  Honor.  I'm sorry.  And that there are --

3          THE COURT:  Wait, wait.  I thought he owned the

4  company.

5          MR. WILLINGHAM:  No, no.  Your Honor, I'm talking

6  about the Government's concern with the Rancho Santa Fe

7  property.

8          THE COURT:  Right.

9          MR. WILLINGHAM:  That moneys were sent from Blessings

10  to Mr. Mayorquin subsequent -- Mr. José Mayorquin, subsequently

11  used to purchase a property in Rancho Santa Fe.

12          THE COURT:  Yeah.

13          MR. WILLINGHAM:  So that's the Government's concern,

14  that it has addressed with the Court.  I've explained this to

15  Ms. Pierson and I've explained this to -- in our financial

16  statements and explained this in court today.

17          Mr. José Mayorquin, in the past, has helped

18  Blessings, Inc., operate.  It's a family business.  By loaning

19  it money.

20          Blessings, Inc., in the past, has repaid some of

21  those moneys and continues to repay some of those moneys to

22  José Mayorquin.

23          What Mr. José Mayorquin has done to use those funds

24  to purchase property is not the property of Blessings, Inc.  It

25  is property owned and utilized, for whatever purpose, by José

Mayorquin.  And it won't -- it isn't really accessible here.

We do -- I think we're not in dispute that the company was once a viable, healthy, high-revenue producing company for what it was.

It went from just north of $33 million in revenue where it was successful to now just under $2 million in revenue on a yearly basis, with a -- just 11 employees versus 173 at the --

THE COURT:  Well, because you have employees in Mexico?

MR. WILLINGHAM:  No, that includes the employees -- that includes just the employees that were here.  Here.

The employees in Mexico are still there, run and operated -- operating on a skeleton shift, the Nogales plant. And, frankly, hopeful --

THE COURT:  Right.  Because what Ms. Pierson says is that you've shifted your -- your business from here to Mexico. And so you haven't really downsized, per se.

MR. WILLINGHAM:  No, that's not accurate, your Honor. I want to make sure -- that's not what happened in this case. Said -- what -- the numbers that I am providing to the Court are the sales and revenue numbers for Blessings, Inc.  That's what Blessings, Inc., produces.  It pays the company in Mexico for product, for processing and utilizing that.

The company in Mexico, which we did not know was an

1    issue today, before coming to court, has also downsized as a

2    result of the -- the Nogales plant has significantly downsized.

3         Like many companies post-NAFTA, your Honor, in order

4    to save processing costs and property costs, in 2011 it moved

5    some of its business operations and separately organized those

6    business operations to Nogales, Mexico.

7         It now continues to have those two separate entities.

8    But that -- both entities have substantially downsized.  And if

9    the Court may allow me a moment to inquire -- I don't have the

10   Nogales company number because it went from hundreds of

11   employees to a lot less than that.  And I can inquire and

12   respond to that.

13        (Pause, Mr. Willingham and Defendant David Mayorquin

14        conferring.)

15        MR. WILLINGHAM:  It's not an exact number but in

16   Nogales -- yeah, there are now approximately 15 employees in

17   Nogales.  They're just hanging on and hoping to get back to

18   business.

19        It's not an unusual circumstance, as the Court

20   might -- might imagine, for the company wanting to move some of

21   those operations.  But the numbers that were provided to the

22   Court here, the 173 employees here and the 11 employees -- in

23   the past and the 11 employees currently were only for the

24   Blessings, Inc., business here.  It was a thriving viable

25   business here, your Honor.

1          THE COURT:  All right.  Ms. Pierson.

2          MS. PIERSON:  So, anyhow, I -- my point to the Court

3    was that the Government fully believes that it would be able to

4    satisfy that $717,700 fine without, you know, endangering the

5    company.

6          And I would note that the $1 million shareholder

7    equity that they're noting there is simply, you know, paper

8    that is owed to Defendant David Mayorquin.  And if you

9    subtracted that, they would have a net worth of over a million

10   dollars.

11         So, you know, I do think that -- that we don't have

12   a -- you know, we accounted for their ability to pay by

13   agreeing to the 1707 -- seventeen hundred and seven [sic]

14   thousand dollar fine.  We accounted for that.  But that they

15   can pay.  And the Court -- you know, we feel confident that

16   that can be paid.  And that the collections division, if

17   necessary, can proceed -- pursue assets to collect that.  We

18   don't think we'll need to.  But, if we did, we think we could.

19         But let me -- I want to talk about David Mayorquin

20   and why his case is so important to us.  And I would note that

21   while he has a full composite of family, also you're seeing in

22   the back representatives of Fish & Wildlife and NOAA, who have

23   come from northern California because this case is so important

24   to both of those agencies.

25         Sea cucumber isn't sexy.  It isn't something that's

1 attractive. It lives on the bottom of the ocean, and it's a

2 bottom feeder. But it's very important to the ecosystems. It

3 is fished individually. It's not mechanically. They don't

4 scoop it up in big nets. Divers go down one by one and pick

5 them off the ocean floor. And the market for this particular

6 product is in Asia.

7 The sea cucumber that they purchase in Mexico for $30

8 a kilo can sell for hundreds or thousands of dollars a kilo

9 once it's dried and shipped to Asia. So the profits are

10 enormous.

11 THE COURT: Let me ask you: Is it illegal in Mexico

12 to harvest sea cucumbers?

13 MS. PIERSON: Well, it's under strict control. And I

14 will tell the Court that we have had -- sea cucumber is the

15 most smuggled form of wildlife in the Southern District of

16 California. It is a huge problem for this district.

17 MR. WILLINGHAM: Not in this case.

18 MS. PIERSON: But this was -- this sea cucumber was

19 not smuggled, per se; although, it was illegally imported.

20 But I will tell you that, you know, when we found sea

21 cucumber smuggled in the border, when it came across in 2013,

22 the stuff was the size of a regular cucumber that you would buy

23 in a grocery store. You know, eight inches long and thick.

24 Now what we find seized at the border are things the

25 size of my little finger. It is unbelievable how this has been

 1  fished and fished almost to its demise.

 2          There used to be sea cucumber in the sea of China.

 3          THE COURT:  Just a sec.  Just a minute.  But --

 4  but -- but if you can harvest it in Mexico -- right?  So -- so

 5  they harvest it in Mexico and they shipped it from Mexico.

 6  Would that be a violation of -- of U.S. law?

 7          MS. PIERSON:  It was harvested in violation of

 8  Mexican law, and that's what's the violation of the Lacey

 9  Act --

10          THE COURT:  So why didn't Mexico prosecute?  Why is

11  the United States prosecuting and not Mexico?

12          MS. PIERSON:  We prosecute in support of the wildlife

13  all over the world.  And, in fact, you know, the Mexicans

14  worked together with us on -- on this case --

15          THE COURT:  I know.  But why didn't Mexico prosecute?

16          I mean, they've got law enforcement people down

17  there.  They've got --

18          MS. PIERSON:  Because we are bringing this case and

19  because these defendants are here in this case, not in Mexico.

20  So we are -- we are going on this case.

21          But at the time -- at the time that these -- that the

22  offense conduct occurred and -- from 2013 -- 2010 to 2013,

23  Mexico didn't have commercial fishing permits for sea cucumber.

24  What they had was something called developmental permits, which

25  were issued at the time because the -- the Government of Mexico

1    was trying to take surveys of the population there to see how

2    much -- you know, how much they could allow for commercial

3    fishing.

4           Well, when they took those surveys, what they found

5    was that there was way less than they thought, and they

6    actually cut off all fishing of any sea cucumber in Mexican

7    waters for six months because they were so concerned about the

8    survey.  Now, and there's now much shorter seasons -- seasons.

9           But while all of this was going on, David Mayorquin

10    was receiving daily e-mails from the vendors that he was

11    dealing with in Mexico.  They were telling him that they were

12    fishing over the limit.

13           I've put many examples in my sentencing memo where he

14    received an e-mail from someone saying, yeah, we fished 62 --

15    62 tons this week, we're only allowed to fish 54.  But we

16    caught 62.

17           So, you know, all right.  They fished eight -- eight

18    tons over the limit, right there in that one e-mail.

19           Other e-mails, where they talked about, you know --

20           THE COURT:  You're talking about sea cucumbers?

21           MS. PIERSON:  Yes.

22           THE COURT:  That's a lot of sea cucumbers?

23           MS. PIERSON:  A very lot of sea cucumbers.

24           They talked about -- there was an e-mail where

25    they -- the vendor reported that the surveillance of the

government was very strong and they had to throw three tons overboard. But they didn't lose their boats, and they weren't arrested. So they thought that if they waited a few days, they could fish some more.

There was other e-mails where a vendor talked about how he could take advantage of the permits that were issued by renaming his boats with the same names of the boats that had gotten permits, so that they could go out fishing for sea cucumber too, falsely claiming to be that permit.

Other e-mails said, hey, we're transferring you 17 tons of sea cucumber, but we don't have any invoices for this and it's not legal to sell them in Mexico without a lawful invoice.

There's other e-mails about asking him to pay -- you know, to charge some of the freight money that the vendor was -- was paying to -- for their share of the bribes to Mexican officials. He received these e-mails with great regularity.

THE COURT: But you're -- you're saying that Mexican officials were taking bribes?

MS. PIERSON: I'm saying that the e-mails from the vendors said that -- they asked -- they asked David Mayorquin if the $32,000 that they were paying in freight, if that could be, instead, his share of the bribe. That's what the e-mail said.

1          THE COURT:  So they were paying Mexican officials

2     bribes?  Is that what you're saying?

3          MS. PIERSON:  That's what I would conclude from that,

4     yes.

5          There was other e-mails from an actual Mexican

6     official offering to sell sea cucumber on a Hotmail account,

7     offering to sell --

8          THE COURT:  No.  Come on.  Are you serious?  A

9     Mexican official --

10         MS. PIERSON:  Yep.

11         THE COURT:  Sends an e-mail saying that they will

12    sell sea cucumbers --

13         MS. PIERSON:  That they will sell sea cucumber.  And

14    they offered to sell it at one price with a legal invoice and

15    another lower price without an invoice.

16         THE COURT:  Well, did the Government file an action

17    against that Mexican official?  I mean, I would think you

18    could --

19         MS. PIERSON:  I -- we have not filed an action

20    against them.  I'm not sure what they have done in Mexico.  But

21    the point being that Mr. Mayorquin could have declined to deal

22    with these people.

23         He received these e-mails on a regular basis, talking

24    about how the -- the surveillance was strong.  We're going to

25    have to move someplace else.  All -- all of this types of --

1      THE COURT:  So he was very much aware of -- of --

2  of --

3      MS. PIERSON:  And he could have made -- he was in the

4  position -- he was the one who was buying.  He could have

5  chosen to do this or not.  And he chose to do it, and he did so

6  because of the money.  Because there was a lot of money to be

7  made in sea cucumbers.

8      THE COURT:  But what was the total amount of revenue

9  from -- from -- from these sea cucumbers?

10      I thought it was small -- relatively small.  I

11  thought it was like $380,000, or something.  Am I --

12      MS. PIERSON:  The -- we struggled with this case and

13  agreed on an amount that was readily provable.  Because what

14  happened was he would get these e-mails regularly and talk

15  about how it was fished.  We caught 15,000 tons today, 15,000

16  kilos.  We caught this many kilos today.  But then it would be

17  processed and -- which would reduce the weight.  And then they

18  held onto it for a while in Tijuana, so that they would sell

19  it -- so we had some difficulty proof-wise, in terms of saying

20  exactly which one of these e-mails tracked with a particular

21  import.  So we agreed on what was readily provable here.

22      But, surely, what he was aware of was a widespread

23  illegal activity on behalf of the vendors that he was dealing

24  with.  Now, whether he bought all of that stuff or he didn't,

25  and whether that's what he imported, we had some proof problems

1    with that.  And that's why, you know, in part -- and in

2    taking -- taking all of this into account, he was allowed to

3    plead to two misdemeanors here instead of a felony.  And we did

4    that in order -- because I was told, by counsel, that if -- if

5    he were allowed to plead to two misdemeanors, that the company

6    could continue.

7            And so in view of the all of the evidence that we had

8    and in view of our desire to try to help this company go

9    forward, we agreed to the two misdemeanors.

10           But I think that that is an important benefit.  And

11   what's important here, too, is that there has to be some

12   deterrence for others.  Because a sentence of probation here,

13   given the duration of this offense, the -- the -- the quantity

14   involved.  The -- the -- the position of the defendant

15   vis-a-vis the company, it -- it's very important to deter

16   others.

17           We have -- since 2013, we have had at least 30 cases

18   of sea cucumbers smuggled here in San Diego in the Southern

19   District.  It is our biggest problem, as far as wildlife goes.

20           And I have -- I have three other cases, I think,

21   pending before other courts, right now, involving smuggled sea

22   cucumber.  We're seeing it with increasing frequency,

23   increasing scale, and sophistication.

24           And what has happened is that -- okay.  They -- the

25   market is in Asia, and they fished the South China Sea.  So

1  they had to move to Mexico, and now Mexico is getting depleted.

2  They're now moving to the northwest United States, where we're

3  finding cases up in Seattle and Oregon area, where people are

4  now overfishing sea cucumber to the tune of a quarter million

5  pounds in a recently charged case up in Seattle.  And it's all

6  going to Asia.  It's all to feed this market because there's a

7  lot of money to be made.  And people are watching this case.

8  It's important to deter others.

9          We feel that the bargain that he got with the plea to

10  get two misdemeanors makes this -- our recommendation very

11  reasonable in this case.

12          We're recommending 12 months in custody, a $4,000

13  fine because that's the low end of the -- of the guideline

14  range.  But we're also -- and we would like that directed to

15  the Magnuson Fishery Management Fund.

16          We're also recommending -- and this is agreed between

17  the parties -- 40,000 --

18          THE COURT:  Why -- why -- why that particular fund?

19  What's --

20          MS. PIERSON:  That is a fund -- we're asking that

21  these -- that the fine -- the $717,000 be directed to the Lacey

22  Act reward fund, and that this particular fine be directed to

23  the Magnuson-Stevens Fishery Management.  They're different

24  funds, and there's different legal basises [sic] for sending

25  the sentencing money to the funds, depending on --

1          THE COURT:  Why not the general fund?  Like we do

2     every other fund?

3          MS. PIERSON:  Because this allows the Court and

4     allows the Government to -- to focus, as the Court was saying,

5     on deterring others.

6          The money then goes to -- to train people, to

7     translate for other cases, to facilitate further investigations

8     and the protection of the species; which it wouldn't do if we

9     just sent it to the general fund.

10          And so, you know, for that reason, in all of these

11     cases that I have, I request that the Court -- courts direct

12     the funds -- the sentences -- the fines to the various funds

13     that they can.  And, to date, I've had -- every court I've

14     asked has also done that, and the defense has agreed that the

15     money could go to those funds.

16          THE COURT:  Okay.  Anything else?

17          MS. PIERSON:  On that, I would submit.

18          THE COURT:  All right.  Thank you.

19          Well, you were like shaking your head the entire time

20     that this was going on, and I watched you.  So you obviously

21     have some disagreements.

22          We're kind of running sort of short on time.  I've

23     got to give my staff a lunch break, and I've got a judges'

24     meeting.  So I think what I'm going to do is I'm going to trail

25     this until two o'clock this afternoon, and we'll pick it up

1  then.  Okay?

2          In the meantime, you can think about your rebuttal to

3  Ms. Pierson's arguments.

4          I must say, she -- she makes pretty powerful

5  arguments, so -- I may very well be changing my tentative.

6          All right.  Good enough.

7          This matter will be -- we'll be in recess until two

8  o'clock.  Thank you.

9          (Recess taken at 12:13 p.m.)

10          (Court resumes at 2:11 p.m.)

11          THE CLERK:  Recalling 2 on calendar, 17-CR-1254, USA

12  versus Blessings, Inc., et al.

13          MR. WILLINGHAM:  Good afternoon, again, your Honor.

14  David Willingham on behalf of David Mayorquin and Blessings,

15  Inc.

16          Mr. Mayorquin is present and on bond in this matter.

17          MS. PIERSON:  Melanie Pierson on behalf of the United

18  States.

19          THE COURT:  All right.  So I believe I've given you a

20  chance to say a few words in rebuttal to Ms. Pierson's

21  comments.

22          Is there anything else you wanted to add?

23          MR. WILLINGHAM:  Yes, your Honor.

24          THE COURT:  Okay.

25          MR. WILLINGHAM:  And I do appreciate the Court's

1  time, and I also wanted to thank the Government for working

2  with us to narrow the dispute that's before the Court.  We

3  worked very hard to do that, to limit the findings that the

4  Court must make.

5          Your Honor, I don't want to take up too much time, if

6  the Court is going to adopt its earlier tentative.

7          To the extent that the Court has concerns that we can

8  address specifically, I'm happy to do that.  However --

9          THE COURT:  Well, I think Ms. Pierson has made a

10  pretty compelling argument for why some time is in order, and

11  so I have reconsidered my tentative.

12          So if you want to address the issues that were raised

13  by Ms. Pierson, now -- now is the time to do it.

14          MR. WILLINGHAM:  I do, and I appreciate the Court's

15  time and attention in that regard, your Honor.

16          THE COURT:  All right.

17          MR. WILLINGHAM:  First, with regard to the regulatory

18  scheme and the Court's question with regard to whether or not

19  this was actually prosecuted, or why wasn't it, and whether or

20  not it was illegal to fish sea cucumbers in Mexico, the answer

21  as conceded by the Government, is that it was -- was and is not

22  illegal to fish sea cucumber in Mexico.  It is not an

23  endangered species, and there is no dispute as to that fact.

24          With regard to the e-mails that were addressed and

25  the timing of the regulatory scheme, your Honor, it's important

for the Court to know that the Government correctly emphasized
that there was a regulatory push by the Mexican government in
2010 to promote promotional fishing permits to fish for sea
cucumber.  And there was no firm regulation or final regulation
in Mexico until 2013.

And the reason that's so important, as conceded by
the Government earlier, your Honor, is that in 2013 -- as set
forth in our papers -- that was when Blessings, before any
notice of a real investigation, your Honor, got out of the
business.  Because it was getting hard to do business in an
appropriate way.  And it wasn't the big evidence part of
Blessings' business, and it decided to stop, voluntarily,
before any intervention from law enforcement.

And that is a big factor that I think the Court did
not hear earlier today and something that the Court should
consider.

There's no question, there's no dispute.  In 2013 was
when this conduct stopped.  And that is something that is
different for -- from, for example, the cases that the Court
heard earlier, where even after law enforcement intervention,
someone continued to do what they were doing.  That's not the
case here, your Honor.

Blessings stopped the conduct.  It did so when the
regulatory framework changed in Mexico, and decided that it
could not in fact continue to engage in the conduct.  And,

1    frankly, it wasn't worth it because the sea cucumber portion of

2    the business was a small sliver of the business that Blessings,

3    Inc., and Mr. Mayorquin engaged in.  That's a strong point,

4    your Honor, that I wanted to make sure the Court was aware of.

5    Because there is no allegation of conduct after 2013.  In fact,

6    from early 2013 on.  And no -- an insinuation might have left

7    the Court with some understanding that that took place, but

8    that is not the case here.

9         Your Honor, with regard to deterrence, which is where

10   I think the ultimate focus point of Ms. Pierson's argument was,

11   I want to express some thoughts as to that.  And I want to

12   focus some of my comments on deterrence, your Honor.

13        First, we don't disagree with the Government that

14   smuggling a sea cucumber is something that should be considered

15   in the Court's sentencing here.  However -- and -- and the

16   message of deterrence.

17        As the Government concedes, this is not a smuggling

18   case.  There is no allegation of smuggling, and smuggling of

19   sea cucumber never occurred in this particular case.  That is

20   not what happened here, your Honor.

21        In this case, all of the sea cucumber was declared to

22   the Government, imported, and then exported.  There were some

23   mistakes made in how that business was operated, and that's why

24   Mr. Mayorquin is here today.  However, it's not a smuggling

25   case.  It's a what -- were the forms adequately filled out?

1   And what was declared on them?

2          But absolutely, 100 percent, all of the shipments

3   that are -- were ever under examination or considered by the

4   Government, sea cucumber was what was described on all of those

5   forms.  And there's no allegation otherwise.

6          It's not a smuggling case.  It's an inaccurate

7   recordkeeping case, your Honor, and that's what this case is

8   about.

9          The Government readily conceded to the Court on

10  several occasions that there is -- that it is not able to prove

11  that shipments were tied to any particular conduct, that

12  certain shipments were fished outside of permitting season or

13  overfished.  It can't prove it because that is not the way the

14  business operated.

15         We made painstaking efforts to present to the

16  Government -- hired a CONAPESCA consultant, your Honor -- and

17  that is the Mexican regulatory authority over fishing -- to

18  outline the regulatory scheme, to provide the Government with

19  information about how sea cucumber was regulated, and then to

20  show the Government that in fact it could not prove those

21  allegations.  And that is, as the Government concedes, why we

22  are here today with a misdemeanor defense -- misdemeanor

23  offense.

24         With regard to the e-mails, that were described by

25  the Government, what was left out and what the Government

1    accurately described as Mr. Mayorquin was taking responsibility

2    for, at a point in time he should have known better about who

3    he was doing business with.  It was hard to do business there.

4         What the Government did not describe -- because it

5    cannot, your Honor -- are responses to most of those e-mails.

6    Those e-mails and what the factual basis is for these types of

7    offenses, those were vendors that were trying to sell

8    Mr. Mayorquin more product, trying to get him to buy more, to

9    pay more, to do things.

10        What there aren't are records of payments for those

11   shipments or for any bribes, your Honor.  That's simply not the

12   case.  And if the Government had those records, I'm sure

13   Ms. Pierson would have presented the records of the payments to

14   the Court or to us in discovery, and they just don't exist.

15   And the reason this case is so important from a deterrence

16   perspective, your Honor, is -- I want to harken back, again, to

17   what the dispute is before the Court.

18        There is no dispute as to the offenses.  No dispute

19   as to the guidelines.  And no dispute as to the fines, even.

20   And Mr. Mayorquin has made very clear that he is more than

21   willing to put his personal financial stake behind the debt

22   that is owed.

23        Congress has spoken to that deterrent message, your

24   Honor.  Here, there is a Zone B guideline offense.  Congress

25   has said to the courts, to everybody out there, where you have

1  a case that is a Zone B guideline offense, that deterrence is

2  satisfied by a probationary sentence, even under the

3  guidelines.

4       And in a case like this, where you have someone, your

5  Honor, who voluntarily stops engaging in the business in 2013,

6  well before the conduct truly becomes at issue, that is

7  something that also speaks to the need for deterrence.

8       Someone who does that, who says, okay, well, this

9  business is not something that we should be engaging in here

10  because it's difficult and it's not our primary business, we

11  can get out of it, and that's okay.  Because we don't need to

12  make -- as Ms. Pierson described -- the overwhelming profits

13  that sea cucumber provide to this day.  That's something

14  that --

15       THE COURT:  You know, I'm sorry, but I'm -- I'm

16  really confused.  And I apologize.  You folks have been living

17  with this case a long, long time and -- a lot longer than I

18  have.

19       MR. WILLINGHAM:  Absolutely.

20       THE COURT:  I see it from time to time.  But you

21  folks have been living with it a lot more than I have.

22       So I've been looking at the Indictment.

23       MR. WILLINGHAM:  Yes.

24       THE COURT:  I've looked at the presentence report.

25  I've looked at the plea agreement, and I am so confused.

1          What exactly is it that Blessings and Mr. Mayorquin

2    did that is in violation of United States law?

3          The plea agreement explains the elements as follows:

4          "That the defendant knowingly imported fish or

5          wildlife into the United States."

6          Okay?  So if you import something that is not

7    importable into the United States, that's a violation.

8          And then it says:

9          "In the exercise of due care, the defendant should

10         have known that such fish or wildlife had been

11         taken, possessed, transported, or sold in

12         violation of or in a manner unlawful under any

13         foreign law or a foreign regulation related to

14         Fish & Wildlife."

15         I thought you just told me that fishing for sea

16   cucumbers was not a violation of Mexican law.  So -- so I'm a

17   little confused.

18         I'm trying to figure out what it is that the

19   defendant actually has admitted to doing, or what it is that

20   the Government has found that the defendant was doing that

21   makes the defendants guilty of this offense.

22         MR. WILLINGHAM:  Your Honor -- and I may speak to

23   that.  I understand the Court's confusion.

24         In the agreement, the parties decided to put aside

25   that -- the factual dispute of the early period of regulation

1   of sea cucumber from, let's say, December 2010 until December

2   2013.

3         The factual e-mails that the Government relies upon

4   in its presentation to the Court, the bulk of them are from

5   2011.

6         From 2010 until roughly the end of 2012 the Mexican

7   Government promoted the fishing of sea cucumber for the purpose

8   of figuring out how much volume of sea cucumber there was in

9   the Yucatan Peninsula.  And it did not --

10         THE COURT:  Promoted?

11         MR. WILLINGHAM:  Promoted.  They were called

12   promotional permits that were -- that were issued without any

13   regulatory consequence for overfishing.

14         THE COURT:  So the Mexican government said, "Here.

15   Come and fish for our -- for our sea cucumbers."

16         MR. WILLINGHAM:  Yes.  You should have a permit.

17   They were called promotional permits.

18         THE COURT:  Yes.

19         MR. WILLINGHAM:  However, there was no regulatory

20   consequence if you fish without, unless you failed to log it.

21   Which is something called a notice of arrival.  That's the

22   English term for that.  And then track it, which is something

23   called a -- a bill of lading.  Or a Mexican term of art is

24   called a guía de pesca.

25         During that time frame, however -- from the middle of

1    2012 until 2013 -- there was a stepped-up enforcement regime in

2    Mexico via CONAPESCA, which is the -- it's -- it's an --

3    initials, your Honor, for the regulatory authority in Mexico.

4    And, in fact, as that stepped-up regulatory regime was further

5    implemented, it became more and more difficult to do business.

6          We know that at some point it's likely that one or a

7    few or even several of the shipments that Blessing engaged in

8    would -- would not have been appropriately permitted.  And what

9    Mr. Mayorquin has pleaded guilty to is that he should have

10   known better, during a period of this time, that some of his

11   suppliers were not fishing appropriately.

12         THE COURT:  I see.

13         MR. WILLINGHAM:  Okay?

14         MS. PIERSON:  Your Honor?

15         MR. WILLINGHAM:  It is not illegal to remove sea

16   cucumber from the Yucatan Bay, outside the peninsula.  It would

17   be illegal to do so if you did so outside of that regulatory

18   division.

19         THE COURT:  All right.

20         MS. PIERSON:  I'm just going to respectfully disagree

21   with his -- with his rendition of Mexican law.

22         We did speak to CONAPESCA officials as well,

23   including officials from INAPESCA, who is the --

24         THE COURT:  Are these the officials that were taking

25   bribes?

1          MS. PIERSON:  INAPESCA officials were not the ones

2     taking bribes.  And the INAPESCA officials were the ones giving

3     the promotional or developmental permits.  They are known both

4     ways.

5          But what we were told and what we were told they were

6     prepared to testify, if called at trial, was that if you fished

7     sea cucumber without a promotional permit from INAPESCA, that

8     was a violation of Mexican law.  Or if you fished in excess of

9     the amount.  Because there was also an amount stated on each of

10    these promotional permits.

11         So if you fished in excess of the amounts of the

12    promotional permit, those were also a violation of law that

13    they would take action on.

14         So with the exception of that, I would say the rest

15    of what he told you was accurate.

16         THE COURT:  Okay.  So -- so getting back,

17    Ms. Pierson, to your comments -- so you -- you told me about

18    some e-mails and the fact that some Mexican officials were

19    taking bribes.  So when did all of that occur?

20         MS. PIERSON:  It took place over the period from 2010

21    to 2013.  They did actually import a couple of sea cucumber

22    importations in early 200 -- 2013, Blessings did.  But more to

23    the point, there -- they didn't stop doing it without any

24    regulatory intervention because the United States Fish &

25    Wildlife agents and the NOAA agents interviewed Ramon Mayorquin

1  in July of 2012.  And in that interview, he told them all

2  fishing for sea cucumber is illegal.  Everybody catches over

3  the amount that they're supposed to catch.  You know, when we

4  go down there, you know, we can't get invoices.  Nobody has the

5  legal invoices.  And if they do have a legal invoice, they want

6  to charge me $2 more a kilogram.  And that was in July of 2012.

7          So it was not unknown to them, then, that the United

8  States was looking at their imports when they made the decision

9  in 2013.

10          THE COURT:  But -- but they're not being charged for

11  importing, are they?

12          I mean, that's not what they pled to.

13          MS. PIERSON:  Yes, they are.  Well, I mean, in terms

14  of -- the Lacey Act has two elements.  One element is that you

15  imported Fish & Wildlife knowingly.  And then the second

16  element being that he knew or should have known that it was

17  either sold, transported, or taken illegally in Mexico.

18          So if it were taken without a permit in Mexico, then

19  that -- and he should have known that that was a -- a

20  violation.  If it were transported without the guía de pesca

21  and he knew that, that would be a violation.

22          If it were fished with using the wrong name on -- on

23  the boat, that would be a violation.  If you were using an

24  invoice that wasn't the real invoice, that's a violation under

25  Mexican law.  And all of those were discussed with him by the

1    vendors in the e-mails.

2         So that's why we're arguing that he certainly should

3    have known --

4         THE COURT:  And those e-mails, the dates of which

5    were --

6         MS. PIERSON:  They were during the period when

7    INAPESCA was doing the promotional permits, where INAPESCA told

8    us that violating any of those permits would subject you to,

9    you know, penalties under Mexican law, including criminal

10   enforcement.

11        MR. WILLINGHAM:  And, your Honor, CONAPESCA is the

12   regulatory authority that has authority to investigate and

13   prosecute those issues.  We consulted with, hired, and

14   presented to the Government the former regional director at the

15   time of CONAPESCA, who said while there was a promotional

16   permitting period, there was no enforcement regime.  It was not

17   illegal at the time.  No way to enforce those laws.  And, in

18   fact, what they wanted to do was to track the issue.

19        What we also did at the time was present all of those

20   documents -- the invoices, the guía de pescas, the CONAPESCA --

21   to the Government.  We have a dispute over some of those

22   documents.  But at the end of the day, your Honor, we wanted to

23   know the same answer, which was, was this illegal at the time?

24        And the answer we were provided by CONAPESCA, through

25   utilization of the consultant and the former regional director,

1  was that in fact -- and we provided the Government with a

2  letter from CONAPESCA.  Was that the conduct of Blessings, at

3  that time, did not appear to be illegal.

4      THE COURT:  But then why did they -- why did they

5  plead?

6      MR. WILLINGHAM:  Because, your Honor, at some point

7  along the way -- it's difficult when to do that.  It became an

8  issue of should Blessings have known better with regard to some

9  of the potential conduct of its -- of its -- of its fishers?

10  Of its -- the people who were in the process?  Should it have

11  known better when it's not responding to those e-mails, not

12  responding to them and encouraging the conduct or paying for

13  the conduct.  It's should -- should Blessings and Mr. Mayorquin

14  have known better?  And that's the standard.

15      And the answer is, yeah, at this point we all should

16  have known better.

17      I mean, your Honor, we're here for a reason.  It's

18  been a five-year investigation and a very, very factually

19  difficult, legally difficult case to understand.  Where the

20  Government acknowledges that it cannot readily prove most of

21  those facts.  Rather than take that case to court, your Honor,

22  where we have a negligence-based misdemeanor standard that

23  Mr. Mayorquin has and did lawfully and truly admit to before

24  the Court, that's the offense that we have here.  And that's

25  why we speak to both deterrence effect and the fact that the

1    guidelines call for the probationary sentence that Probation

2    recommends.  Remember, it's not just us asking for that.  It's

3    Probation recommending that sentence.

4           And here, what you have is a course of conduct that

5    is difficult to ascertain, even the illegality that the Court

6    is facing.  Imagine being a nonlawyer business representative.

7    We have valid disagreements.  Valid disagreements over whether

8    or not it was an appropriate legal regulatory scheme at the

9    time.  It, frankly, took us months to figure that out.

10          And they -- I thanked the Government, and I will

11   thank the Government again for allowing us to figure it out and

12   make the presentation that ended up resolving this case.

13          What ends up being true is that before the Court you

14   have a company that decided -- and she will say after law

15   enforcement.  But, your Honor, that was -- (A), there's a large

16   dispute about that interview of a Spanish-speaking individual

17   that's not our client.  It's Mr. Ramon Mayorquin.

18          And (B), no question that -- that they decided --

19   they weren't aware of a real investigation.  It's Fish &

20   Wildlife asking them questions and deciding, hey, we don't need

21   this headache.  This is not what we were declaring, the sea

22   cucumber.  Let's stop.  Let's go back to -- or continue with

23   what got us where we were, to be so successful.

24          And, your Honor, I appreciate the Court's time and

25   attention here.  And we have really worked hard to put together

a resolution before the Court that makes sense as the Court got
to the heart of it earlier, which is what is the best for
everybody.  The deterrence factor that the Government points
to, I think, I put at least my two cents into.  But I will say,
your Honor, as the Court should be concerned with general
deterrence -- and it is clearly, in this case.  Again, it's not
a smuggling case and it never was.  It's a case, really, where
the Government took a look at and picked apart the bulk of
Blessings business over a five-year period, and we end up with
a resolution before the Court.

And when Blessings and Mr. Mayorquin personally has
been so damaged by what has happened and is willing to put
himself behind the Court's concerns and to work to satisfy
those concerns, we're hopeful that the Court can stick with its
tentative and issue a sentence in accordance.

THE COURT:  Final word, Ms. Pierson?

MS. PIERSON:  I just wanted to tell the Court that
actually, in Mr. Mayorquin's own words on April 5th of 2011, he
was writing back and forth e-mails to a customer in the United
States, in Seattle, in English.

And the customer was saying to him, well, you know,
what's the difference between having -- because they -- they
had been having the dialogue about the fact that Blessings did
not have a permit and their vendors in Mexico did not have
permits to fish.

1    And the -- the guy in Seattle said, "Well, it's been

2    over 70 months.  60 tons have crossed already.  What's the big

3    deal about the permit?"

4    And David Mayorquin wrote back and said, "Big

5    difference.  Without permit, product can be taken away."

6    So he was well aware that the Government could seize

7    the product, and what have you, if his vendors didn't have

8    permits, and he was aware that they didn't have permits.

9    MR. WILLINGHAM:  And well aware that he didn't want

10   to engage in that business, your Honor, and communicating that

11   to his vendors.  And there was a period of time when different

12   zones required -- in Mexico required different issues and

13   different permits, which was the point of that e-mail.  As -- I

14   believe Ms. Pierson is shaking her head yes.

15   That e-mail is indicative of Mr. Mayorquin trying to

16   follow what his vendors in Mexico are telling him and

17   explaining that to someone who wants to buy the product here in

18   the United States.

19   THE COURT:  All right.  Matter submitted?

20   MS. PIERSON:  (Nods head.)

21   THE COURT:  All right.  I'm going to sentence

22   Blessings, Inc., first.  I suspect that's probably the easier

23   one of the two.

24   This is a Base Offense Level 6.  Increase by two

25   levels under 2Q2.1B1A.  Increase by a further 14 levels under

2Q2.1B3A.

I believe the starting culpability score was 5. The involvement -- or involvement in or tolerance of criminal activity was a plus two. The acceptance of responsibility is a minus one. And I'll point out that this is all identical -- or that this is identical to Probation's recommendation.

I think there's a difference in the base calculations with Probation. I'm not sure. But my notes indicated that they had arrived at a total offense level of 28, but I think it's because of the amounts in question, the market value in question; and there's a difference.

The fine range appears to be somewhere in the range of $1,510,728 to $3,021,456.

After considering the 3553(a) factors, the Court will put Blessings, Inc., on probation for a period of five years on the following terms and conditions:

No. 1, they'll abide by -- abide by all laws, including state, local, and federal.

They'll comply with all standard conditions of supervision, including the following:

The organization shall notify the Court or the probation officer immediately upon learning of any material adverse change in its business or financial condition or prospects. Or (B), the commencement of any bankruptcy proceeding, major civil litigation, criminal prosecution, or

administrative proceedings against the organization, or any

investigation or formal inquiry by governmental authorities

regarding the organization.

Furthermore, the organization shall -- No. 2, the

organization shall submit to (A), a reasonable number of

regular unannounced examinations of its books and records and

appropriate business premises by the probation officer or

experts engaged by the Court.  And, (B), interrogation of

knowledgeable individuals within the organization.

Compensation to and costs of any experts engaged by the Court

shall be paid by the organization.  The fine I'll impose is

$973,490, which shall be paid through the clerk of the U.S.

district court.  It will be paid at the rate of $194,698 per

year.  I'll order that half of that fine be paid no later than

90 days from today's date.

In addition, the Court will impose a special

assessment of $400.  And I don't believe -- well, I'm sorry.

There was a forfeiture, wasn't there?

A forfeiture to be owed, ordered in the amount of --

what was it?  273,000, or something?

MR. WILLINGHAM:  Your Honor, $237,879, which has

already been satisfied.

THE COURT:  All right.  And the Government agrees to

that correct?

MS. PIERSON:  Yes.

1          THE COURT:  And do I have an order?

2          THE CLERK:  It's already been filed, Judge.

3          THE COURT:  It's already been filed.

4          THE CLERK:  It's already been filed.

5          THE COURT:  All right.  Now, Ms. Pierson, you said

6     you wanted that fine to be made payable --

7          MS. PIERSON:  Yes, I would like it directed to the

8     Lacey Act Rewards Fund, please.

9          THE COURT:  So the U.S. -- the clerk of the U.S.

10    District Court shall forward the fine -- payments of the fine

11    to --

12         MS. PIERSON:  The Lacey Act.

13         THE COURT:  The Lacey Act Rewards Fund.

14         THE CLERK:  How do you spell "Lacey"?  Hey, judge,

15    how do you spell "Lacey"?

16         MR. WILLINGHAM:  L-A-C-E-Y.

17         THE COURT:  All right.  Then I guess, Mr. Mayorquin,

18    you were designated to accept the document reflecting the terms

19    of your probation.  Is that correct?

20         THE DEFENDANT:  Yes, your Honor.

21         MR. WILLINGHAM:  The probation for Blessings, your

22    Honor?

23         THE COURT:  I'm sorry?

24         MR. WILLINGHAM:  The probation for Blessings, your

25    Honor.

1          THE COURT:  I'm sorry.  For Blessings, yes.  All
2  right.

3          Counsel, if you would pick up the -- I assume you
4  have the terms of probation on hand?

5          THE CLERK:  Your Honor, these are not going to be --
6  I don't have the corporation ones.

7          THE COURT:  You don't have them?

8          THE CLERK:  No, I don't have them.

9          THE COURT:  All right.  Well, I'll simply state them
10 for the record on the record.

11         THE CLERK:  They'll be in the judgment, Judge.

12         THE COURT:  Now, turning our attention to Mr. David
13 Mayorquin.  Again, the guidelines are a starting point.

14         By the way, I'm not sure.  I don't think I allowed
15 Mr. Mayorquin to allocute.  I think I probably should do that
16 before I impose judgment.  It may be that there is something
17 that he says that could change my mind.

18         Mr. Mayorquin, you have a right to address the Court.
19 Is there anything you wish to say, sir?

20         DEFENDANT MAYORQUIN:  Yes, your Honor.

21         Your Honor, I would like to thank the Court -- I
22 would like to thank the Court for its time.  Thank you, Judge.

23         I would like to thank the Government for their help
24 and for helping resolve this matter.  It's -- it's been a
25 long -- it's been a long time, and I just thank them for

1  helping us to -- to finish.

2          I would like to thank my family for their support.

3  Not only for coming here but for all of these years, for

4  helping me through such -- such a hard time.

5          I -- I'm extremely sorry for anything that -- that I

6  have done wrong and everything that I have done wrong, and I

7  promise the Court that I'll be diligent in all matters to

8  business and to family that I conduct, every day of my life.

9          THE COURT:  All right.  By the way, I'm not sure if I

10  asked Probation.  Does Probation have anything to add?

11          PROBATION OFFICER LEE:  Nothing further, your Honor.

12          THE COURT:  All right.  The guidelines are as

13  follows:

14          This is a Base Offense Level 6, increase by two

15  levels under 2Q2.1B1.  Increase by a further four levels under

16  2Q2.1B3A.  Reduce by two levels for acceptance.  That's a Total

17  Offense Level of 10.

18          He has no criminal history score.  Criminal History

19  Category I.  The range for sentencing is six to twelve months.

20          I've heard a lot of arguments.  And I think both

21  sides have -- have presented their positions quite forcefully

22  and quite adequately.

23          Ms. Pierson, look, there's -- there's no question but

24  that this kind of -- or the -- the -- the violation of -- of

25  environmental laws should be -- should be dealt with forcefully

1    and seriously.

2              And I have no doubt, whatsoever, that -- I think you

3    indicated there were other cases.  That there are other cases

4    pending before other courts.

5              Perhaps those other cases will have stronger,

6    clearer, more definitive conduct and violations than this case.

7    This case, to say the least, is somewhat confusing and not

8    crystal clear.  The result of that is that for me to impose a

9    custodial sentence for this defendant, in order to have his

10   sentence act as a deterrence, in my opinion, would probably

11   actually be an injustice rather than a justice.

12             I suspect that the Government probably has clearer

13   cases, cases that would be resolved not as misdemeanors but as

14   felonies and which could justify -- justify a custodial period

15   much, much more than this case.

16             Now, as I said a little while ago, Probation has

17   recommended that I impose a fine.  I think that in this

18   particular case we can do more benefit by imposing the fine

19   than for me to impose a 12-month sentence with a $40,000 fine.

20   I would much prefer, much prefer to impose a fine of --

21             MR. WILLINGHAM:  $973,490 dollars, your Honor?

22             THE COURT:  Okay.  You beat me to it.  Yes.  That

23   fine.  Which would then be used to -- could be used to --

24   for -- for better purposes, rather than put the defendant in

25   custody for 12 months.

1          I -- I just -- to me, that strikes me as being,

2     really, not very helpful at all.  But I think -- and I'm sure

3     that the agencies have -- have -- have become aware of your

4     forceful prosecution of this case.  And I hope that those who

5     are in charge of administering and putting to use that almost

6     $1 million worth of fine will be able to find a useful purpose

7     for that money, much more so than seeing this defendant be in

8     custody for 12 months.  And as I previous -- or some other --

9     or some other period of time.  Six months, or whatever it is.

10          I also think that -- as a pointed out earlier -- it

11    makes a lot more sense to me to make sure that we can do what

12    we can do to keep this company afloat, to keep it operating, to

13    keep employed, to keep the family employed.  And so I concur

14    with Probation.  I think that their recommendation of probation

15    for five years is appropriate.

16          So I am going to put Mr. Mayorquin on probation for a

17    period of five years.  As a condition of probation, he will

18    obey all laws, including state, local and federal.  He'll

19    comply with all standard and mandatory conditions of probation,

20    including the following:

21          He will report all vehicles owned or operated or in

22    which he has an interest to the probation officer.

23          He will submit his person, his property, his

24    residence, his office, or his vehicle to a search conducted by

25    a United States probation officer at a reasonable time and in a

1   reasonable manner, based upon reasonable suspicion of

2   contraband or evidence of a violation of condition of release.

3   Failure to submit to a search may be grounds for revocation,

4   and the defendant shall warn any other residents that the

5   premises may be subject to searches pursuant to this condition.

6          He'll provide complete disclosure of personal and

7   business financial records to the probation officer as

8   requested.  And that will include any and all records

9   pertaining to or related to his ownership interest in either

10  Blessings, Inc., or -- what was the other entity?

11         MS. PIERSON:  Adab.

12         MR. WILLINGHAM:  Adab, A-D-A-B, comma, Inc.

13         THE COURT:  He'll also notify the collections unit,

14  United States Attorney's Office, of any interest in property

15  obtained directly or indirectly, including any interest

16  obtained under any other name or entity, including a trust,

17  partnership, or corporation, until the fine or the restitution

18  is paid in full.

19         He'll notify the collections unit, the United States

20  Attorney's Office before transferring any interest in property

21  owned, directly or indirectly, including any interests held or

22  owned under any other name or entity; including the trust,

23  partnership, or corporation.

24         He'll be prohibited from opening checking accounts or

25  incurring new credit charges or opening additional lines of

credit without approval of the probation officer.

Now, I will order that he pay a fine. I note that the guideline range for the fine is 12,500 to 125,000 dollars. However, I am going to depart above that guideline range for the reasons I've all -- already stated.

His counsel has agreed that that would be a fair and just judgment, and so I am going to impose a fine of $973,490, which will be paid in installments of $194,698. And I'll order that half of that be paid no later than -- I believe I said 90 days before, didn't I?

THE CLERK: Yes.

THE COURT: Yes, 90 days. And I'll make this fine to be jointly and severally paid, both by Blessings, Inc., and Mr. David Mayorquin.

In other words, if one pays it, the other one will receive credit for whatever has been paid or whatever portion thereof has been paid.

MR. WILLINGHAM: And can we ask that the Blessings judgment be amended in the same way?

THE COURT: Yes.

MR. WILLINGHAM: Thank you.

THE COURT: I will order that until the fine has been paid, nothing in my order will preclude or foreclose the United States from exercising any and all legal actions, remedies, and processes available to it to collect the fine.

1        And, finally, I will impose a -- a special assessment

2   of $50.  That is $25 per count.

3        MS. PIERSON:  Will the Court be imposing the

4   restitution of $40,000?

5        THE COURT:  Yes.

6        MR. WILLINGHAM:  Yes, your Honor.  There's an

7   agreed-upon resolution of restitution for this related to the

8   loss offense, $40,000 to CONAPESCA, C-O-N-A-P-E-S-C-A.

9        THE COURT:  All right.  And that has not been paid?

10       MR. WILLINGHAM:  That has not been paid, your Honor.

11  Frankly, we have to work with the Government to figure out how

12  to get that paid.  We'll work with the Government to do that

13  and file a notice.

14       THE COURT:  All right.  So I will order the defendant

15  to pay $40,000 of restitution to CONAPESCA through the clerk of

16  the U.S. District Court.  Payment of that restitution shall be

17  forthwith during any period -- never mind.

18       The defendant shall pay the restitution during his

19  supervised -- during his probation at a rate to be mutually

20  agreed upon between the defendant and the Government, but in no

21  amount any less than $500 per month.

22       As I said, the payments do not foreclose the United

23  States from exercising all legal actions, remedies, and

24  processes available to it to collect the restitution judgment.

25       And until restitution has been paid in full, the

1   defendant shall notify the clerk of the court and the United

2   States Attorney's Office of any change in the defendant's

3   mailing or residence address no later than 30 days after the

4   change occurs.

5          Is there anything else I may have missed,

6   Ms. Pierson?  Anything I've omitted?

7          MR. WILLINGHAM:  I believe the Court ordered the

8   mandatory special assessment of $50.  If not --

9          THE COURT:  Yes, I did.

10          MS. PIERSON:  Right.  Well, I had been asking for

11   the -- half of this -- I had been asking for the fine for

12   Mr. Mayorquin to be directed to the Magnuson-Stevens fund and

13   the corporations fund to go to the Lacey Act Reward Fund.  Can

14   we split them, so that half of it goes to Lacey Act and half

15   goes to Magnuson-Stevens?

16          THE COURT:  Your wish is my command.

17          Is there any objection?

18          MR. WILLINGHAM:  No objection, your Honor.

19          THE COURT:  All right.  We'll amend the judgment for

20   Blessings, Inc., to reflect the same accordingly.

21          THE CLERK:  Your Honor, one more time, please.  I was

22   answering Judge Battalia's response, your Honor.

23          MR. WILLINGHAM:  Yes.  For the benefit of the Court,

24   half of the fine for each of Blessings and Mayorquin ordered to

25   be basically concurrently paid and credited to both will go to

1    the Lacey Act Rewards Fund and the other half will go to the

2    Magnuson --

3              MS. PIERSON:  -- Stevens Fishery Management Fund.

4              MR. WILLINGHAM:  Maybe you should say that.

5              THE COURT:  Magnuson.

6              MR. WILLINGHAM:  Stevens Fishing Management Fund.

7              THE COURT:  Stevens.

8              MS. PIERSON:  Fishing Management Fund.

9              THE COURT:  Fishing Management Fund.

10             MR. WILLINGHAM:  We'll -- again, we'll work with the

11   Government to make sure it gets to the right place, your Honor.

12             THE COURT:  Okay.  (Laughing.)  All right.  So I

13   believe that pretty much addresses all of the issues except for

14   waiver of appeal?

15             MS. PIERSON:  And I would move that the remaining

16   counts be dismissed and --

17             THE COURT:  All right.  Let me, first of all, get the

18   waiver of appeal.

19             Mr. Willingham, do you acknowledge that both

20   Blessings, Inc., and Mr. David Mayorquin have waived all right

21   to appeal and collateral attack?

22             MR. WILLINGHAM:  Yes, your Honor.

23             THE COURT:  Mr. David Mayorquin, on your own behalf

24   and on behalf of Blessings, Inc., do you acknowledge that all

25   rights to appeal and collateral attack have been waived?

1            DEFENDANT DAVID MAYORQUIN:  Yes, your Honor.

2            THE COURT:  All right.  Probably should deliver the

3 conditions of supervised -- I'm sorry.  The conditions of

4 probation to Mr. Mayorquin.  And I will order that

5 Mr. Mayorquin report to the probation department by not later

6 than 4:00 p.m. tomorrow, since it's already three o'clock.

7 I'll order that he report to Probation by no later than 4:00

8 p.m., tomorrow in order to have a probation officer assigned

9 and deal with what they need to do.

10            Is there anything else that we need to address?

11 Anything I have missed?  Anything I've overlooked.

12            MR. WILLINGHAM:  Yes, I believe the Court could

13 actually order the bond exonerated.  I know Ms. Pierson asked

14 for it.  And then one other issue for the operation of the

15 business, your Honor.  This is a housekeeping issue.  It

16 requires travel to and from Mexico.

17            May the judgment reflect that the defendant, during

18 the period of probation, Mr. Mayorquin is allowed to travel to

19 and from Mexico?  That will make things run smoother with

20 Probation if we just do that now.

21            THE CLERK:  It already says that, Judge.

22            THE COURT:  We did?

23            THE CLERK:  Well, no, he's allowed to travel with

24 permission of probation, so --

25            THE COURT:  Yeah, but what he's asking is that give

1    permission now, I think.

2              THE CLERK:  Okay.

3              THE COURT:  Any objection?

4              MR. LEAHY:  No objection, your Honor.

5              THE COURT:  All right.  It will be so ordered.

6              All right.  Well, thank you both.  I appreciate it.

7    You both forcefully argued your positions quite eloquently.

8              MR. WILLINGHAM:  Thank you.

9              THE COURT:  And I appreciated hearing from you all.

10   All right.

11             THE CLERK:  Underlying Indictment, Judge?

12             THE COURT:  The motion to dismiss the underlying

13   Indictment is granted

14             MS. PIERSON:  Remaining counts dismissed.

15             THE COURT:  Thank you.

16             (Conclusion of proceedings.)

17                        -0-

18

19

20

21

22

23

24

25

*Certificate*

--oOo--

I certify, by signing below, that the foregoing is a correct stenographic transcript of the oral proceedings had in the above-entitled matter this 27th day of September, 2018.  A transcript without an original signature or conformed signature is not certified.  I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

/S/ Amanda M. LeGore
_____

AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR